# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 42
The People &c.,
  Appellant,
   v.
Corey Dunton,
  Respondent.

Andrew E. Seewald, for appellant.
Sabrina Singer, for respondent.
Center for Appellate Litigation, amicus curiae.

RIVERA, J.:

The issue on this appeal is whether the Appellate Division erred in granting defendant's writ of error coram nobis on the ground of ineffective assistance of appellate counsel for failure to assert a claim on direct appeal that defendant was improperly removed

- 1 -

from the courtroom without prior warning during the announcement of the verdict and the polling of the jury. Because a prior warning was not practicable under the unique circumstances of this case, the trial court did not violate defendant's statutory and constitutional right to be present during this material stage of the trial and appellate counsel was not ineffective for omitting this nonmeritorious claim. Therefore, we reverse the Appellate Division.

I.

Factual and Procedural History

Defendant Corey Dunton was 16 years old when he opened fire into the Bryant Park skating rink at a 17-year-old who refused to turn over his jacket. The shots struck the victim four times, wounding his hands and legs. Another stray bullet struck a 14-year-old bystander, which left him paralyzed from the waist down. For these acts, a jury convicted defendant of attempted murder in the second degree (Penal Law §§ 110.00; 125.25 [1]), two counts of assault in the first degree (Penal Law § 120.10 [1], [3]), two counts of criminal possession of a weapon in the second degree (Penal Law § 265.03 [1] [b], [3]), assault in the second degree (Penal Law § 120.05 [2]), and reckless endangerment in the first degree (Penal Law § 120.25). On this appeal, we are concerned with the circumstances that informed the trial court's decision to remove defendant from the courtroom during the reading of the verdict based on his disruptive behavior. As the record establishes, the court and law enforcement officials considered defendant a security threat. Defendant's detention at Rikers Island pending trial was marked by several violent outbursts, which the

prosecution reported to the court and required adoption of various security precautions. For example, before jury selection, the prosecutor informed the court that there had been a "[host] of incidents, some charged, some indicted at Rikers Island." These incidents included unprovoked assaults on another inmate and a corrections officer, and possession of weapons. The prosecutor informed the court that video footage from one such incident showed defendant throwing a plastic chair which bounced off the wall and hit an officer, then showed defendant repeating the action with a second chair. The prosecutor further stated that defendant's record at Rikers was "rife with these types of incidents." Based on this information and for security reasons, the court ordered that defendant not stand and only turn his head but not his body when introduced to prospective jurors.

As the trial progressed, corrections and court officers apprised the court of defendant's continued violent conduct, which led the court to take additional security precautions. On one occasion, defendant created a "flood situation" in a holding area and punched an individual who responded. The court noted for the record that this misbehavior resulted in stricter security during transportation to the courthouse, and that defendant's other "alleged acts of violence" against officers and fellow inmates "only heightens whatever tension there may be in the courtroom" and "puts everyone on heightened awareness." On another occasion, officers informed the court that during a break, defendant

spit at an officer and damaged a computer.[1] Officers did not arrest defendant only to avoid delaying the trial.

The court also observed that defendant was at times malingering or otherwise attempting to delay trial, which resulted in a rebuke from the court that it would not tolerate any purposeful delays. The court specifically warned defendant that, if for any reason defendant failed to appear in court "because of [his] own doing," the trial would go on without him.

Defendant's misconduct extended to the courtroom, increasing concerns about witness and juror safety, and leading to more warnings and the continuation of security measures. For example, after the prosecutor told the court that a witness for the prosecution and members of the gallery had informed him that defendant was staring down the witness during her testimony, smirking and laughing at her and covering his mouth which, according to the prosecutor, was a signal for the witness to keep her mouth shut, the court warned defendant to conduct himself appropriately and not act in any way that might intimidate a witness. Then, when defendant later took the stand in his own defense, counsel made a request that defendant be permitted to stand and point to a chart. The court denied the request stating it would put defendant "five or six feet from the jury" without any

---

[1] The dissent downplays the significance of these incidents in the courthouse, stating, for example, that the flood merely delayed the start of trial (*see* dissenting op at 4), glossing over that defendant punched someone who attempted to provide assistance. But defendant's actions on these occasions demonstrated to the trial judge that defendant was prone to unpredictable and violent behavior, even inside the sanctity of the court.

physical restraints, and that allowing him near the jury was contrary to corrections and court officers' recommendations.

Notice of defendant's continued alleged violent attacks outside the courtroom put the court and law enforcement on heightened alert of a potential in-court outburst given the impending verdict and defendant's explosive tendencies. Specifically, toward the end of trial, the prosecutor informed the court that earlier in the week defendant, "without warning," "punched another corrections officer" in the face and that, as in prior incidents, chemical agents had been used to subdue defendant. At that point, the court stated its intent to place defendant in handcuffs for the reading of the verdict, citing the safety of "everyone in the courtroom." Defense counsel objected to the handcuffing and pointed out that, throughout the trial, defendant had "behaved like a gentleman" in the courtroom. The court agreed but explained that because defendant had multiple times "punched someone entirely unprovoked and by surprise," he might "for no reason, out of the blue, just throw a punch" at someone in the courtroom.

When the jury notified the court that it had reached a verdict, the court brought up the restraint issue again and clarified that court and corrections officers had requested that defendant be restrained. The court further explained that it had reviewed video footage of one of the earlier altercations, which it described as depicting defendant "clearly trying to escalate and create some hostility." The court further observed that corrections officers were able to deescalate the situation only through their "patience and professionalism."

In response, defense counsel argued that defendant had "earned the right not to be cuffed" through his good behavior in court and informed the court that defendant had given

counsel his "assurance" that he would remain calm during the announcement of the verdict. The prosecution said it would defer to the recommendation of the court officers but again pointed out that defendant had "six, perhaps seven pending indictments arising from incidents that occurred at Rikers Island" with corrections officers and fellow inmates. The court ordered defendant to be handcuffed, citing defendant's "documented history of [ ] acting out" and "becoming violent and being physically aggressive with court personnel [and] fellow inmates." The court commented that it had "seen things get ugly very fast in a courtroom" and that it was weighing the "safety and well-being" of those in what the judge described as a "quite small" courtroom.

After defendant was produced, the court informed him that he was being handcuffed for the "safety and security of everyone in the courtroom" and that the court "want[ed] to make sure that everybody remains in control and nothing happens." Defendant indicated that he understood.[2]

The jury entered the courtroom and the foreperson announced, without interruption, the verdict of guilty on each of the first five counts. At that point, defendant audibly

---

[2] The dissent quotes the trial court's comment to defendant that requiring him to wear handcuffs in the courtroom was "something [it had] never done before" (dissenting op at 6). To the extent the dissent means to suggest that defendant may have been unaware of the court's ongoing concern that he presented a security risk, this is belied by the court's decision not to allow defendant to stand up before the jury, its various warnings to him throughout trial regarding his out-of-court conduct, and the very fact that the court determined it was necessary to impose restraints during the reading of the verdict for the "first time" (*id.*).

laughed. The foreperson continued and announced guilty on the sixth count. Defendant

then interrupted, and the following took place:

> "THE DEFENDANT: You thought that was gonna break me?
> I thought about sentencing. I don't care about sentencing. You
> think you all broke me? Y'all didn't break me.
>
> THE COURT: Please control your client.
>
> THE DEFENDANT: I'm good. You all didn't break me. Give
> me the whole 50 years. I don't give a f*** about nothing. It's
> over. It is what it is. All 12 of y'all can sit there and say you all
> did the right thing. That's what I want y'all to know. Live with
> that. Live with that.
>
> THE COURT: Officers, take charge.
>
> THE DEFENDANT: Live with that. It is what it is. I ain't
> gonna walk out of here. What y'all done ain't gonna break me.
> You ain't gonna see me cry. I'm walking out the same way I
> came in, immaculate. Suck my d***."

Court officers then removed defendant from the courtroom. In defendant's absence,

the foreperson announced a guilty verdict on the seventh and final count and the court

polled the jurors, who each concurred in the verdict.

Once the jurors were excused, the court put the following on the record:

> "THE COURT: . . . Mr. Dunton began to act out. He became
> quite verbally abusive, began screaming out profanity. It
> became upsetting. I saw the jurors were becoming upset. I
> allowed it to go on for a few seconds. I tolerated it for a while.
> Eventually, I did ask the court officers to take charge and have
> him removed from the courtroom. In hindsight, it appears the
> right decision to have him handcuffed in the courtroom."

The court then asked whether the attorneys had any motions, and defense counsel said he

had nothing further.

On direct appeal, defendant argued that: (1) arresting officers violated *Payton v New York* (445 US 573 [1980]) by coercing him to leave his apartment; (2) inculpatory statements he made during fingerprinting should have been suppressed; (3) the lineup identification was unduly suggestive; and (4) the People's summation deprived him of a fair trial. The Appellate Division, First Department, affirmed the judgment, rejecting all of defendant's arguments (184 AD3d 473 [1st Dept 2020]).[3] This Court denied leave to appeal (35 NY3d 1093 [2020]). Shortly thereafter, the Second Department reversed a conviction in *People v Antoine*, where the defendant had made a disruptive verbal outburst after the guilty verdict was read but before the jury was polled, and the court concluded that the trial court erred in failing to issue any warning to the defendant before removing him from the courtroom (189 AD3d 1445, 1446 [2d Dept 2020]). After *Antoine* was issued, the appellate counsel who supervised defendant's direct appeal contacted the Office of the Appellate Defender (OAD) regarding filing a writ of error coram nobis on behalf of defendant. OAD filed the writ, arguing that appellate counsel was ineffective for failing to raise the following three claims which would have necessitated vacatur of the Appellate Division's order and/or reversal of the judgment: (1) the trial court violated defendant's constitutional and statutory right to be present during the rendering of the verdict when it removed him from the courtroom without prior warning; (2) the sentencing court erred in not making an express determination on the record whether defendant was eligible for youthful offender

---

[3] As to the two unpreserved arguments noted by the dissent here (dissenting op at 7), the Appellate Division rejected them on the merits, as an alternative holding (184 AD3d at 474).

consideration; and (3) defendant's maximum sentence of 25 years was excessive given his age and history of trauma and mental health issues. In support of the writ, defendant submitted an affirmation from the supervising attorney in which counsel stated as to the first claim, that "to the best of [his] recollection, [he] did not consider raising a challenge to [defendant's] removal from the courtroom during the verdict without sufficient warning."

The Appellate Division granted the writ, vacated its prior order affirming defendant's judgment of conviction, reversed the judgment, and ordered a new trial (2022 NY Slip Op 68332[U] [1st Dept 2022]). The court concluded that appellate counsel was ineffective for failing to raise a mode of proceedings error based on defendant's ejection from the courtroom without prior warning during a material stage of the trial, in violation of his Sixth Amendment right to be present. Based on that decision, the court did not consider defendant's other arguments in support of the writ. A Judge of this Court granted the People leave to appeal (39 NY3d 1110 [2023]).

II.

Defendant's Removal Without Warning Was Proper

The prosecution argues that the trial court's removal of defendant from the courtroom was a proper exercise of discretion because, given his history of violent outbursts, the court had reason to believe defendant posed an imminent risk of harm. Alternatively, the prosecution contends that any violation of defendant's right to be present was de minimis and would not require reversal because he was present for six of the seven

counts and the recitation of the verdict is a mere "ministerial act" for which defendant's presence would have made no difference. The prosecution further suggests that the court's warnings to defendant that the trial would continue in his absence should he fail to appear based on his out-of-court misconduct were sufficient to put defendant on notice that the court could remove him for any in-court misbehavior. Defendant contends that his removal without advance warning was unlawful based on his prior good behavior in the courtroom and the fact that he was handcuffed during a purely verbal outburst, and counters that there is no de minimis exception to the right to be present. Defendant also argues that CPL 260.20 entitled him to a warning specific to in-court conduct.

We reject the prosecution's claim that any error was de minimis based on the timing of defendant's removal from the courtroom. There is no material stage of the proceeding that is any less consequential to a defendant's right to be present. However, we agree that the trial court's actions were appropriate under the unique circumstances of this case and in no way contrary to law.

A defendant has a constitutional right "to be present at all material stages of their criminal trial," which includes the reading of the verdict and the polling of the jury (*People v Ramirez*, 2024 NY Slip Op 00848, *1 [2024]; *see also People v Sanders*, 39 NY3d 216, 221 [2023] [a defendant "is still presumed innocent" until "the jury returns to the courtroom, publicly announces the verdict, and, if polled, confirms the verdict"]). Further, CPL 260.20 provides that a defendant must be present during the trial but may be removed if they are "disorderly and disruptive" such that the "trial cannot be carried on with [the defendant] in the courtroom [] if , after [they] have been warned by the court that [they]

will be removed if [they] continue such conduct, [they] continue to engage in such conduct." A court may dispense with the constitutional and statutory warnings when it is impracticable to give them (*People v Palermo*, 32 NY2d 222, 225 n * [1973]; *see e.g. People v Byrnes*, 33 NY2d 343, 350 [1974] [the trial court did not err in removing the defendant without warning when he "leaped on the counsel table and lunged in the direction of (a witness) in an assaultive manner"]; *People v Wilkins*, 33 AD3d 409 [1st Dept 2006] [same, where the defendant "suddenly charged across the floor and attempted to attack the prosecutor"] *lv denied* 7 NY3d 905 [2006]; *People v Jackson*, 16 AD3d 156 [1st Dept 2005] [same, where the defendant "punched his attorney in the face and then engaged in a lengthy and violent struggle with numerous court officers"] *lv denied* 4 NY2d 887 [2005]).[4] That was the case here.

The court and corrections officers considered defendant a safety risk. Their concerns were justified based on defendant's history of alleged violence at Rikers against corrections officers and inmates and his possession of weapons, and his in-court intimidation of a prosecution witness during her testimony. To ensure the safety of the jury and all those present in the courtroom, the court imposed security measures limiting defendant's movements. Thus, the court prohibited defendant from standing during his direct testimony

---

[4] The dissent cites Appellate Division authority for the proposition that "a warning will be found practicable in all but the most extreme cases, usually involving violent in-court conduct" (dissenting op at 10, 13), but this Court has never limited the impracticability exception in such manner. Though *Wilkins* and *Jackson* may have involved violent in-court conduct, we have never foreclosed the possibility that a warning is impracticable where a defendant makes a verbal outburst and the court reasonably believes that danger is imminent.

because of his close proximity to the jury, and restrained defendant in accordance with court and corrections officers' recommendations. Defendant's delaying tactics also led the court to admonish him three times that it would proceed without defendant should he fail to appear.

These concerns and the tension caused by defendant's conduct reached their apex once the jury announced it had reached a verdict. Although counsel conveyed to the court defendant's assurances that he would remain calm, the court ordered defendant be handcuffed and explained to counsel and defendant that this was for security reasons. In disregard of his professed assurances, and demonstrating his contempt for the proceedings and the court, defendant disrupted the announcement of the verdict three times. First, he laughed after the foreperson announced guilty on five counts, including the top count of attempted murder.[5] Second, moments later, after the foreperson announced guilty on the sixth count, defendant directed a verbal outburst at the jury. Third, after the court instructed counsel to control defendant, defendant continued his tirade, using profanity directed specifically at the jury. It was only after defendant could not be controlled and the jurors had become visibly upset by defendant's verbal abuse that the court directed the officers to take charge and defendant was removed from the courtroom.[6]

---

[5] The dissent agrees that, "[a]lthough it is unclear from the record whether defendant's laugh was audible to the trial court, it is reasonable to assume that it was" based on the small size of the courtroom (dissenting op at 11 n 4). This is further confirmation that defendant was perilously close to the court reporter, the bench, and the jury.

[6] Though the dissent may be correct that defendant uttered only two profanities, we cannot say from the record that the court was being "hyperbol[ic]" in its description of the outburst

Contrary to the dissent's view, the totality of defendant's misconduct in and out of the courthouse rendered a warning to defendant immediately preceding his removal impracticable (*see* dissenting op at 2). Any delay in defendant's removal would have permitted further disruption of the proceedings and risked physical danger to the public, jurors, judge, court officers and staff and the lawyers. As the court had earlier observed, "things get ugly very fast in a [quite small] courtroom." The fact that defendant was handcuffed did not eliminate the possibility that he could physically move about and further disrupt the proceedings and injure those in attendance. Indeed, defendant had previously displayed violent sudden outbursts and there was no certainty that handcuffs would prevent him from reacting in the same manner. There was also good reason for the court to doubt that defendant would heed a warning, in the middle of an outburst and immediately preceding his removal. After all, defense counsel was unable to control defendant during his outburst, which was in disregard of the court's efforts to maintain safety in the courtroom and was a direct attack on the jury and its effort to complete its solemn duty. Further, any incentive defendant may have had to maintain composure during trial, while in the presence of the jury, was no longer present once the foreperson announced guilty on

---

(dissenting op at 7 n 3). A cold record, upon review by an appellate court, cannot convey a speaker's volume or tone or the rapidity of the communication, nor can it reflect the reactions of others or the tension in the courtroom. Indeed, the court described not only defendant's outburst but the jury's reaction to it. As we have stated, the trial judge has a unique vantage point to observe persons in the courtroom, and has "inherent authority and the affirmative obligation to control conduct and decorum in the courtroom, in order to promote the fair administration of justice for all" (*People v Nelson*, 27 NY3d 361, 367 [2016]).

six of seven counts, including the top count of attempted murder. These factors informed the court's reasonable, on-the-spot decision that it needed to remove defendant swiftly to ensure the safety of everyone in the courtroom.

Contrary to the dissent's claim, defendant's removal did not violate the constitutional warning requirement set out in *Illinois v Allen* (397 US 337 [1970]). There, the defendant was verbally "obstreperous" and used "vile and abusive language" purposely to disrupt the trial (*id*. at 341-342). He did not have a history of unprovoked violence like defendant here, nor did the trial court remove him for any legitimate concern about the security of the courtroom. The dissent also makes the baseless assertion that we have created a new rule (*see* dissenting op at 2). The rule is well established and unchanged by our decision here: a defendant must be warned that their continued disruptive conduct will result in removal from the courtroom, unless such warning is impracticable under the circumstances. It will be the rare case where waiting to provide such warning imperils the safety of those in the courtroom. But this is such a case, notwithstanding the dissent's attempts to recharacterize defendant's actions as unremarkable. Defendant was repeatedly violent in and out of the courthouse requiring additional security, he blatantly disregarded his assurance that he would remain calm during the announcement of the verdict, and the jurors were visibly disturbed by the outbursts defendant directed at them. A warning to defendant during his verbal tirade was simply impracticable. A court with a reasonable basis for its security concerns based on a defendant's prior violent conduct, disrespect for the solemnity of the proceedings, and inability to maintain their composure after promising they would, need not wait until the court's fears are realized (*see Wilkins*, 33 AD3d at 410

[a defendant "should not be permitted one free swing" (internal quotation marks omitted)]).[7]

## III.

### Ineffective Assistance of Appellate Counsel

In the context of a coram nobis application, "appellate advocacy is meaningful if it reflects a competent grasp of the facts, the law and appellate procedure, supported by appropriate authority and argument" (*People v Alvarez*, 33 NY3d 286, 290 [2019], citing *People v Stultz*, 2 NY3d 277, 285 [2004]). Effective appellate representation "by no means requires counsel to brief or argue every issue that may have merit; rather, appellate attorneys are afforded wide latitude in deciding which points to advance" (*id*., citing *Stultz*, 2 NY3d at 285). However, even a single failure which "undermine[s] confidence in the outcome" of the proceedings before the court (*Strickland v Washington*, 466 US 688, 694 [1984]), or otherwise deprives a defendant of meaningful representation, amounts to ineffective assistance of counsel (*see People v Turner*, 5 NY3d 476 [2005]; *People v Borrell*, 12 NY3d 365, 368-369 [2009]).

The Appellate Division held that appellate counsel was ineffective solely for failing to raise the removal issue on direct appeal, reasoning that the trial court's ejection of defendant without a warning immediately before his removal violated defendant's right to be present during a material stage of the trial, which would have required reversal of

---

[7] Given our holding, we need not address the prosecution's remaining argument.

defendant's conviction. As we have explained, the trial court did not violate defendant's

right because, at the time of trial, it was well established that warnings could be dispensed

with when impracticable, like here. In other words, the Appellate Division erroneously

concluded that the law was clear that the trial court committed reversible error, and

appellate counsel was not ineffective for failing to raise a meritless claim (*Stultz*, 2 NY3d

at 286-187).[8] Moreover, and contrary to the dissent's interpretation, the affirmation from

the supervising lawyer on defendant's direct appeal fails to establish that appellate

counsel's advocacy in this case did not reflect a competent grasp of the facts, law, or

appellate procedure regarding a defendant's right to be present in the courtroom. The

affirmation declares that supervising counsel did not consider raising a challenge to

defendant's removal from the courtroom but critically fails to explain why. The absence of

such reason is particularly curious given that counsel provides an explanation for his

decision not to raise the youthful offender issue—he thought it unlikely the sentencing

court would have granted defendant youthful offender status—and further admits that in

making this decision he did not distinguish between general grounds and specific bases for

such a request, citing *People v Middlebrooks* (25 NY3d 516 [2015]). Counsel's silence as

to the reasons for not considering the courtroom removal challenge cannot be determined

---

[8] The dissent suggests we have addressed the issues out of order by looking to the merits of the underlying removal claim before assessing appellate counsel's alleged ineffectiveness (*see* dissenting op at 2). But we cannot say whether appellate counsel was ineffective for failing to raise a claim without first deciding whether that claim had a basis under the law at the time. As we have discussed, it was clear at the time of defendant's appeal that he had no meritorious claim based on his removal from the courtroom, and, therefore, appellate counsel was not ineffective on that ground (*see Stultz*, 2 NY3d at 285).

from the record. Thus, defendant failed to meet his burden on a coram nobis petition of "demonstrating that counsel was ineffective" for failing to raise the removal issue (*Alvarez*, 33 NY3d at 290).

IV.

The Appellate Division erroneously concluded that the trial court violated defendant's right to be present, and therefore incorrectly granted defendant's writ of error coram nobis on the sole ground that appellate counsel was ineffective for failing to raise this meritless claim on direct appeal. Accordingly, the order should be reversed and the case remitted to the Appellate Division for consideration of issues raised but not determined by that Court.

Aarons, J. (dissenting):

There are two issues in this case. *First*, was defendant deprived of the effective assistance of appellate counsel when his attorney on direct appeal failed to challenge his removal from the courtroom without a warning during the trial? To answer this question, counsel's performance must be assessed against the circumstances and law at the time of the direct appeal – roughly four years ago.

*Second*, did the trial court erroneously remove defendant from the courtroom without a warning? To answer this question, the Court could apply existing law, exercise

its authority to refine or expand its decisional law, or even create a new doctrine to meet the needs of the case.

The majority answered these questions in reverse order. Starting with the second question, the majority created a new rule to conclude that warning defendant to stop his verbal outbursts inside the courtroom was not "practicable" based upon his history of violent conduct outside the courtroom (*People v Palermo*, 32 NY2d 222, 225 n [1973]).[1] Having deemed the issue of defendant's removal meritless, the majority then addressed the first question and held that appellate counsel was not ineffective for failing to raise that now-meritless issue. This conclusion is irrational because it depends on a standard that did not exist at the time of appellate counsel's representation (*cf. People v Flowers*, 28 NY3d 536, 541 [2016] [declining to charge counsel with anticipating "a novel and unprecedented statement of law"]; *People v Feliciano*, 17 NY3d 14, 28 [2011] [finding appellate counsel was not ineffective for failing to assert "novel" arguments that called for "an extension of or change in—not an application of—existing law"]).

Further, the majority's new framework for practicability compromises the constitutional and statutory right to be present at one's trial (*see* US Const, 6th Amend; NY Const, art I, § 6; CPL 260.20). The majority insists on its new rule because defendant's case presents "unique circumstances" (majority op at 2, 10). To the extent the majority points to defendant's record of alleged violent incidents while in the custody of New York City

---

[1] The majority protests my characterization of this as a "new rule" (majority op at 14). Although the warning requirement itself is "well established and unchanged" (majority op at 14), the majority's expansion of the practicability exception to that requirement is new.

Department of Correction at Rikers Island where he was incarcerated as an adolescent and held for years before conviction, those circumstances are not unique (*see e.g.* Steve J. Martin et al., Special Report by the *Nunez* Independent Monitor at 5 [June 8, 2023]; Independent Commission on New York City Criminal Justice and Incarceration Reform, A More Just New York City at 26 [2017]; United States Attorney for the Southern District of New York, CRIPA Investigation of the New York City Department of Correction Jails on Rikers Island at 8 [Aug. 4, 2014]).

The Appellate Division applied existing law and determined that appellate counsel was ineffective for omitting from the direct appeal a challenge to defendant's removal without warning from the courtroom during a material stage of his trial (2022 NY Slip Op 68332[U] [1st Dept 2022]). Additionally, in the interest of judicial economy, the Appellate Division reversed defendant's judgment of conviction and ordered a new trial based upon its conclusion that defendant's unwarned removal violated his right to be present at trial and constituted a mode of proceedings error (*id.*, citing *People v D'Alessandro*, 2010 NY Slip Op 75591[U] [1st Dept 2010] [finding appellate counsel ineffective and that "judicial economy dictates that we dismiss the indictment at this stage"]). I would do the same. I therefore respectfully dissent.

I

In November 2013, 16-year-old defendant demanded a 17-year-old's winter jacket at an ice-skating rink. The 17-year-old refused and skated away. When the 17-year-old came around again, defendant pulled a gun and fired, hitting the 17-year-old with four bullets and causing permanent injury to his hand. A fifth bullet lodged itself into the spine

of a 14-year-old bystander, paralyzing him from the waist down. Following defendant's arrest, he was incarcerated at Rikers Island to await trial. In early 2014, a psychologist determined that defendant had the cognitive capacity to achieve academically but showed symptoms of mental health disorders, and his conduct was the product of early onset issues of psychological trauma requiring treatment with medication and therapy.

By the time defendant's trial began in 2016, he had spent three years jailed at Rikers Island where, his current attorney tells us, he did not receive the intense mental health care his diagnoses required. During his lengthy pretrial incarceration, defendant was involved in or instigated violent incidents with correction officers and other incarcerated individuals, resulting in indictments.

Defendant's violent incidents at Rikers did not stop when the trial started, though the closest such conduct came to the courtroom was when he spat on a correction officer and damaged a computer "downstairs" at the courthouse.[2] Defendant's nonappearance delayed the start of trial on a few occasions – for example, when he allegedly created a "flood situation" and punched another person at the jail the previous day, and when he tried to bring ointment and toothpaste to court that correction officers prohibited as contraband. Accordingly, the trial court warned defendant that if he failed to appear as a result of his

---

[2] Although the majority discusses "incidents in the courthouse" (majority op at 4 n 1; *see also* majority op at 14), the courtrooms are under the control of the judges and court officers, and the holding cell and transfer areas are under the control of correction officers employed by the Department of Correction – the same agency that runs Rikers Island. To determine whether a CPL 260.20 warning was practicable at the time it ought to have been issued, it is more appropriate to look at defendant's behavior inside the *courtroom* as opposed to his behavior in other settings.

out-of-court conduct, the trial would proceed without him (*see People v Parker*, 57 NY2d 136, 141 [1982]). In addition, the court restricted defendant's movements during the trial, by not permitting him to stand or turn his body during jury selection or stand to point at a chart during his testimony.

During the trial, a prosecution witness began "equivocating and having difficulty articulating . . . her answers" during her testimony. The witness and "people who were in the audience" complained to the prosecutor that defendant was staring, "smirking and laughing" at the witness and covering his mouth, which the witness interpreted as a signal to "keep her mouth shut." The prosecutor, outside of defendant's presence, brought the alleged conduct to the attention of the court, which trial counsel denied observing but suggested was innocuous and probably misconstrued. Neither the prosecutor nor the court observed the complained-of conduct, but nevertheless the court concluded the allegation alone triggered its "obligation . . . to simply remind [defendant] not to engage in any conduct that in any way intimidates a witness." When defendant returned, the court administered that warning, hastening to add it was "not accusing [him] of anything." Defendant responded that he understood the court's warning, and no other witness-intimidation complaints appear in the record. And relevantly here, the court never warned defendant that any in-court disruptive conduct during the trial would result in his removal from it (*see* CPL 260.20; *People v Parker*, 57 NY2d at 140-141; *compare People v Fecu*, 205 AD3d 436, 436-437 [1st Dept 2022], *lv denied* 38 NY3d 1150 [2022]; *People v Brown*, 192 AD3d 1603, 1603-1605 [4th Dept 2021]).

That brings us to the verdict. While acknowledging defendant had acted appropriately in the courtroom throughout trial, the trial court, over objection, determined defendant's conduct outside the courtroom required him to be handcuffed during the verdict for the safety of everyone else in the courtroom. "I have seen things get ugly very fast in a courtroom," the court said to counsel outside of defendant's presence. So, "in the interest of avoiding having an ugly situation," court officers would not remove defendant's handcuffs when he returned to hear the verdict. When defendant arrived, the court mostly repeated its rationale for leaving defendant in handcuffs, adding, "That's something we've never done before. This is the first time we're doing that."

The jury returned and announced the verdict. The first five counts, including the top count of attempted murder, came back guilty, and at that point the transcript reads, "The defendant laugh[ed]." When the sixth count also came back guilty, the transcript reflects the following:

> "THE DEFENDANT: You thought that was gonna break me?
> I thought about sentencing. I don't care about sentencing. You
> think you all broke me? Y'all didn't break me.
>
> "THE COURT: Please control your client.
>
> "THE DEFENDANT: I'm good. You all didn't break me. Give
> me the whole 50 years. I don't give a f*** about nothing. It's
> over. It is what it is. All 12 of y'all can sit there and say you all
> did the right thing. That's what I want y'all to know. Live with
> that. Live with that.
>
> "THE COURT: Officers, take charge.
>
> "THE DEFENDANT: Live with that. It is what it is. I ain't
> gonna walk out of here. What y'all done ain't gonna break me.

You ain't gonna see me cry. I'm walking out the same way I came in, immaculate. Suck my d***."

Defendant was removed from the courtroom, and, at the court's direction, the foreperson announced the jury's finding of guilt on the seventh count without defendant there to hear it. Nor was defendant present when the jurors each confirmed their guilty verdict on all counts.

Once the jury was discharged, the trial court stated "for the record" that defendant "began to act out. He became quite verbally abusive, [and he] began screaming out profanity."[3] The court further stated it "saw the jurors were becoming upset." Still, the court stated it "allowed [defendant's conduct] to go on for a few seconds," and "tolerated it for a while" before the court "ask[ed] the court officers to take charge and have him removed from the courtroom."

On direct appeal, appellate counsel made no mention of defendant's unwarned removal from the courtroom in the brief, much less put it in issue. Instead, appellate counsel focused on four other issues, two of which were unpreserved and all of which were unavailing. The Appellate Division affirmed the judgment of conviction, and this Court denied leave to appeal.

According to the supervising attorney on direct appeal, defendant's trial counsel contacted him in December 2020 regarding *People v Antoine* (189 AD3d 1445 [2d Dept

---

[3] Even a cursory reading of the transcript reveals the trial court injected hyperbole into the "record" it created of defendant's verbal outbursts. Defendant uttered two profanities: the first was directed at no one, and the second occurred *after* the court directed defendant's removal.

2020], *lv denied* 37 NY3d 953 [2021]), in which the Second Department reversed a conviction and ordered a new trial based upon a defendant's unwarned removal from a courtroom during a jury verdict. The supervising attorney, in turn, contacted the Office of the Appellate Defender about petitioning for a writ of error coram nobis alleging the failure to raise defendant's removal on direct appeal amounted to ineffective assistance of appellate counsel. That office consented to submitting the petition. In support, the supervising attorney affirmed he made the decisions "about the claims to be pursued on [direct] appeal," and he "did not consider" challenging defendant's unwarned removal.

## II

"[A] single failing in an otherwise competent performance may, in a rare case, be so egregious and prejudicial as to deprive a defendant of [their] constitutional right to effective legal representation" (*People v Keschner*, 25 NY3d 704, 723 [2015] [internal quotation marks and citations omitted]; *see People v Ambers*, 26 NY3d 313, 317-318 [2015]). "To rise to that level, the omission must typically involve an issue that is so clear-cut and dispositive that no reasonable [appellate] counsel would have failed to assert it, and it must be evident that the decision to forgo the contention could not have been grounded in a legitimate [legal] strategy" (*People v McGee*, 20 NY3d 513, 518 [2013]; *accord People v Keschner*, 25 NY3d at 723).

Failing to challenge defendant's removal from the courtroom qualifies as such an omission, for it was "a 'winning argument' [that would have led] to appellate reversal of a judgment of conviction and sentence" (*People v Keschner*, 25 NY3d at 723; *see People v Flowers*, 28 NY3d at 541; *People v Turner*, 5 NY3d 476, 481 [2005]; *see also People v*

*Espinosa*, 40 NY3d 1065, 1070 [2023, Rivera, J., dissenting] ["The law on an omitted claim need not be 'definitively settled' at the time of trial and the claim need not be a 'clear winner' before its omission can qualify as ineffective assistance" (quoting *People v Turner*, 5 NY3d at 483)]).

A

A defendant has a well-established right to be present at all material stages of a trial, which includes the reading of the verdict (*see e.g. People v Rivera*, 23 NY3d 827, 831 [2014]; *People v Williams*, 85 NY2d 945, 947 [1995]; *People v Byrnes*, 33 NY2d 343, 349 [1974]; *see generally* US Const, 6th Amend; NY Const, art I, § 6). A defendant may waive that right either expressly or, as relevant here, impliedly through disruptive conduct (*see Illinois v Allen*, 397 US 337, 343 [1970]; *Snyder v Massachusetts*, 291 US 97, 106 [1934], *overruled on other grounds by Malloy v Hogan*, 378 US 1 [1964]; CPL 260.20; *see also* Rules of App Div, 1st Dept [22 NYCRR] § 604.3 [a]; Rules of App Div, 2d Dept [22 NYCRR] § 702.2 [a]). Whether express or implied, a defendant's waiver must be voluntary, knowing and intelligent to be valid (*see People v Parker*, 57 NY2d at 140; *People v Epps*, 37 NY2d 343, 349 [1975]).

A court may only remove a defendant for conduct "so disorderly and disruptive . . . that [the] trial cannot be carried on with [the defendant] in the courtroom" (CPL 260.20). Even then, a court may only order a defendant removed if, after the court warns the defendant that continuing the conduct will result in removal, the defendant "continues to engage in such conduct" (CPL 260.20). Carving out a narrow exception to the rule, this Court has stated that the warning is only necessary if it is "practicable" to issue it (*People*

*v Palermo*, 32 NY2d at 225 n). That is, a court must issue a warning if there is a "practical opportunity" to do so (*People v Wilkins*, 33 AD3d 409, 410 [1st Dept 2006], *lv denied* 7 NY3d 905 [2006]). Generally, a warning will be found practicable in all but the most extreme cases, usually involving violent in-court conduct (*see e.g. People v Jackson*, 16 AD3d 156, 156 [1st Dept 2005], *lv denied* 4 NY3d 887 [2005]; *see also People v Brown*, 192 AD3d at 1605).

B

There is no dispute that defendant was removed from the courtroom without the required warning (*see* CPL 260.20), thus narrowing the focus to whether issuing that warning was practicable – which it was. Nothing in the record indicates that defendant acted out violently. Indeed, the court severely restricted defendant's movement during trial, refusing at times to allow him to stand or even turn his body to face the jury, and there is no indication that he failed to comply with those instructions. At the time of the verdict, he was handcuffed, and there is no suggestion in the record before us that defendant was even standing when he spoke. Nor did defendant's defiant statements to the jury constitute a threat of violence to them or anyone else (*see People v Byrnes*, 33 NY2d at 349; *People v Hendrix*, 63 AD3d 958, 959 [2d Dept 2009], *lv denied* 13 NY3d 797 [2009]; *compare People v Davis*, 270 AD2d 162, 163 [1st Dept 2000], *lv denied* 95 NY2d 795 [2000]). Given these circumstances, the trial court should have instructed defendant to cease his verbal disruptive conduct or be removed.

The record plainly discloses practical opportunities to issue a pre-removal warning. When defendant laughed, the court said nothing.[4] Likewise, when defendant said, "You thought that was gonna break me?" and four more sentences after that, no one-sentence warning followed even though the court spared a moment to admonish trial counsel to control defendant, and then let him go on – notwithstanding its "inherent authority and . . . affirmative obligation to control conduct and decorum in the courtroom, in order to promote the fair administration of justice for all" (*People v Nelson*, 27 NY3d 361, 367 [2016]). Then, in response to defendant's nine-sentence verbal outburst, no warning issued – the court simply directed the officers to "take charge" (*see People v Burton*, 138 AD3d 882, 884 [2d Dept 2016]). This timeline confirms it was practicable to issue a one-sentence warning that another outburst would waive his right to attend his trial – a conclusion the trial judge tacitly confirmed by stating he "tolerated it for a while." Thus, defendant's unwarned removal was a mode of proceedings error entitling him to reversal (*see id.*; *compare People v Nelson*, 27 NY3d at 367). When his attorney did not raise the issue on direct appeal, defendant's right to the effective assistance of counsel was violated (*see People v Turner*, 5 NY3d at 485).

---

[4] Defendant's laughter was loud enough to be heard and recorded by the court reporter. Although it is unclear from the record whether defendant's laugh was audible to the trial court, it is reasonable to assume that it was. According to the transcript, the well of the courtroom was "quite small" and defendant was close to both the court reporter and the bench.

C

The People resist this conclusion by proposing several arguments that might have dissuaded appellate counsel from challenging defendant's removal on direct appeal. Of course, no argument could have discouraged the supervising attorney from selecting this issue because, as he stated in his affirmation, he never considered the issue at all. Put another way, appellate counsel's decision to omit this issue was not "grounded in a legitimate [legal] strategy" (*People v McGee*, 20 NY3d at 518).

Further, none of the People's arguments "could" constitute a legitimate strategy that would have thwarted appellate counsel from raising defendant's unwarned removal (*id.*). The People first suggest that counsel could have thought the totality of the court's other warnings put defendant on sufficient notice that he could be removed. True enough, defendant may have been issued *Parker* warnings that put him on notice that the trial would continue in his absence if his out-of-court conduct prevented his appearance (*see People v Parker*, 57 NY3d at 140-142), but those warnings by definition do not address in-court behavior. Consequently, *Parker* warnings cannot do the job of CPL 260.20, which requires an express warning that targets specific disruptive conduct that must not be repeated in the courtroom or risk removal. No reasonable appellate counsel would reject the plain text of that provision for the People's "effective warning" rubric that finds no support even in the cases they cite (*see People v Hemphill*, 173 AD3d 471, 479 [1st Dept 2019] [defendant removed for outburst during verdict, though "[e]arlier in the trial, the court had warned defendant that any *further outbursts by him would result in his removal from the courtroom while his trial continued*" (emphasis added)], *affd* 35 NY3d 1035 [2020], *revd on other*

*grounds* 595 US 140 [2022]; *People v Irick*, 203 AD3d 517, 517 [1st Dept 2022] [defendant removed from a suppression hearing without a CPL warning when he threw himself on the floor, and he had been warned that "if he persisted in his announced plan to prevent the hearing from going forward, *the hearing would proceed in his absence*" (emphasis added)]; *People v Paige*, 134 AD3d 1048, 1050, 1052 [2d Dept 2015] [defendant removed for shouting expletives at a police witness after "he had been *repeatedly warned* by the trial court that if he did not desist in" his pattern of disruptive behavior that "*he would be barred from attending the remainder of the trial*" (emphasis added)]).

Even less convincing is the People's argument that appellate counsel could have thought a pre-removal warning was impracticable based upon defendant's documented history of violent outbursts outside the courtroom. The People point to no authority for that proposition. The best they can find is a case of another defendant who "attempted to attack a prosecutor, in close proximity to jurors," and "had to be restrained by numerous court officers, some of whom were injured in the violent struggle" (*People v Wilkins*, 33 AD3d at 410). Yet, even that case turned on that defendant's "violent behavior *in the courtroom* [that] went far beyond mere disruption, and created an emergency necessitating his immediate removal" (*id.* [emphasis added]). Even if appellate counsel considered this a colorable opposing argument, there was no legal authority to support it. This argument could therefore not have provided a basis to omit a challenge to defendant's removal from his direct appeal.

The People also posit that counsel could have been swayed by the absence of authority supporting a full reversal of the conviction given defendant's presence during the

verdict on six of the seven counts. That would have been an unreasonable consideration given long-standing authority holding mode of proceedings errors result in reversal (*see People v Patterson*, 39 NY2d 288, 295 [1976], *affd* 432 US 197 [1977]). Further, there is no recognized *de minimis* violation of the right to be present during a material stage of a trial – a point on which the majority and I agree (*compare People v Chisolm*, 85 NY2d 945, 947-948 [1995]). Consequently, defendant's absence for only one out of the seven counts and the jury poll could not have convinced reasonable appellate counsel versed in the law at the time of the direct appeal to omit a challenge to defendant's unwarned removal.

D

The majority concludes that defendant failed to meet his burden to show appellate counsel was ineffective because the supervising attorney's affirmation "critically fails to explain why" he did not consider raising the removal issue (majority op at 16). This is a red herring, for the relevant inquiry is whether omitting that issue was the product of a "legitimate [legal] strategy" (*People v McGee*, 20 NY3d at 518). The supervising attorney's affirmation completely answers that question.

In any event, it is clear from the supervising attorney's affirmation "that appellate counsel's advocacy in this case did not reflect a competent grasp of the facts, law, or appellate procedure regarding a defendant's right to be present in the courtroom" (majority op at 16; *see People v Stultz*, 2 NY3d 277, 285 [2004]). The trial transcript of defendant's unwarned removal for a verbal disruption was prima facie evidence of a mode of proceedings error. When the supervising attorney affirmed he "did not consider" raising a challenge to the removal, he could have only reasonably meant two things: either he did

not read the record thoroughly enough to spot the error, or he did not understand the significance of the error. The second option seems more likely, as the interruption during the rendering of the verdict, followed by defendant's removal, practically jumped off the pages of the trial transcript. Either way, counsel's admission demonstrates a less-than-competent grasp of a dispositive issue in this case.

## III

Turning to the underlying trial error, the majority adopts a version of the People's argument that the warning was impracticable based upon defendant's history of violent out-of-court outbursts. Under the majority's new addition to the judge-made practicability exception, "[a] court with a reasonable basis for its security concerns based on a defendant's prior violent conduct, disrespect for the solemnity of the proceedings, and inability to maintain their composure after promising they would, need not wait until the court's fears are realized" (majority op at 14).[5] Read in the light of this case's "unique circumstances" (majority op at 2, 10), the majority's new standard really means a defendant who engages in a nonthreatening verbal disruption during trial may be removed without

---

[5] Contrary to the majority's view (*see* majority op at 16 n 8), defendant had a clearly meritorious claim at the time of his direct appeal. That much is evident from the unanimous decision in the appealed-from First Department order, which the majority calls erroneous but does not say how that court misunderstood or misapplied the law as it existed at the time. Further, this case is here because trial counsel read *People v Antoine* (189 AD3d 1445), which was decided under existing precedent, six months after defendant's direct appeal. There, notwithstanding a two-justice dissent, this Court denied leave to appeal from the Second Department's order of a new trial (37 NY3d 953 [2021]) on facts nearly identical to this case – except for any mention of that defendant's out-of-court violent conduct, which only just *today* became relevant in assessing whether a one-sentence pre-removal warning is practicable.

warning based upon that defendant's history of violent out-of-court conduct, even if that conduct never enters the courtroom. And whether that unwarned removal violates the defendant's right to be present at trial now turns on a judge's fear of violence rather than the "practical opportunity" to say a few words of warning required by law (*People v Wilkins*, 33 AD3d at 410; *see also* Black's Law Dictionary [11th ed 2019], practicable ["reasonably capable of being accomplished; feasible in a particular situation"]).

The majority's new vision of practicability is a long way from its origin. The caveat that warnings should be issued when practicable was mentioned in *People v Palermo* (32 NY2d 222), in which this Court found no constitutional error in briefly gagging a disruptive defendant after warning him to cease such conduct (*see id.* at 225-227). This Court suggested in dicta that "where practicable the defendant be warned that his conduct may result in the imposition of court sanctions" (*id.* at 225 n). This Court also correctly observed that *Illinois v Allen* "did not specifically require that a warning be given prior to the imposition of *each* sanction" authorized by that case, i.e., gagging a defendant, holding a defendant in contempt, or removing a defendant from the courtroom (*People v Palermo*, 32 NY2d at 225 n [emphasis added]; *see Illinois v Allen*, 397 US at 343; *compare People v Cornelius*, 107 AD2d 757, 757 [2d Dept 1985]). Left unsaid was the Supreme Court's conclusion respecting the *specific* sanction of removal:

> "[W]e explicitly hold today that a defendant can lose his right
> to be present at trial if, after he has been warned by the judge
> that he will be removed if he continues his disruptive behavior,
> he nevertheless insists on conducting himself in a manner so
> disorderly, disruptive, and disrespectful of the court that his
> trial cannot be carried on with him in the courtroom" (*Illinois
> v Allen*, 397 US at 343).

Given this holding, the majority's practicability exception to the warning requirement, based upon a court's assessment of a defendant's predisposition to violence as revealed by out-of-court (and consequently off-the-record) conduct, is constitutionally suspect.

The pre-removal warning is no obstacle to a court's discretionary responsibility to maintain order, security, and decorum in the courtroom. Quite the opposite – the Supreme Court invented the warning in *Illinois v Allen* (397 US at 342-343) to facilitate that discretion by providing a means to constitutionally remove a disruptive defendant from a trial. Consequently, whether the court had "good reason . . . to doubt that defendant would heed a warning" (majority op at 13) cannot possibly be relevant to whether it was practicable for the court to have issued it in the first place (*compare People v Lundquist*, 180 AD3d 806, 807 [2d Dept 2020], *lv denied* 35 NY3d 1028 [2020]; *People v Burton*, 138 AD3d at 884).

I cannot condone a standard of practicability that would make it easier to deprive some defendants of their rights and not others based upon an assumption that violent behavior at the jailhouse reliably predicts violence in the courtroom. Indeed, that assumption is belied by the record in this case – the *first* case decided under the majority's new standard (*cf. People v Rivas*, 306 AD2d 10, 12 [1st Dept 2003] ["there is no indication in the record, or even in the court's later recitation of the events, that Rivas himself participated in any further disruption after he was warned to be quiet"]).

It should not be easy to dispense with the warning requirement for any defendant. After all, relinquishing the constitutional and statutory right to be present at trial is subject to a waiver analysis (*see People v Parker*, 57 NY2d at 140; *People v Epps*, 37 NY2d at

349). The CPL 260.20 warning is not a courtesy but a critical assurance of constitutionality – if a defendant continues to disrupt the trial after being warned of the consequence of removal, the continuation implies a valid waiver. Given this function,[6] permitting courts to disregard that assurance whenever a defendant with a history of out-of-court violence engages in a nonthreatening verbal disruption is profoundly misguided. I decline to endorse such a practice.

Order reversed and case remitted to the Appellate Division, First Department, for consideration of issues raised but not determined by that Court. Opinion by Judge Rivera. Chief Judge Wilson and Judges Singas, Cannataro, Troutman and Bannister concur. Judge Aarons dissents in an opinion. Judges Garcia and Halligan took no part.

Decided April 23, 2024

---

[6] The warning provision was added to CPL 260.20 to codify the holding in *Illinois v Allen* (397 US at 343; *see e.g.* Letter from NY County Dist Atty, June 14, 1971, Bill Jacket, L 1971, ch 789 at 8).